UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:  Case No.: 17-11448-12

MARK EUGENE JOHNSON,

    Debtor.

---

**<u>MEMORANDUM DECISION</u>**

    The Debtor filed a Chapter 12 petition on April 25, 2017. The Debtor filed a Chapter 12 Plan on August 22, 2017. On September 15, 2017, Hiawatha National Bank objected to confirmation of the Plan. The Debtor filed an Amended Chapter 12 Plan on November 3, 2017, and a Second Amended Chapter 12 Plan on December 14, 2017.

    A confirmation hearing was held on December 14, 2017, and the Court took the matter under advisement. The Debtor also moved for substantive consolidation of this case with the petition of one of his sole-member LLCs, Springbrook Grain Farms, LLC. On January 5, 2018, the Court held a telephonic hearing on the Motion to Consolidate and inquired of the parties their position on the Motion in light of the status of the hearing on confirmation. The Court took the matter of substantive consolidation and its possible effect on confirmation under advisement.[1] Related matters are set for a final hearing on creditor All Wheels Financial's Motion for Relief from Stay and

---

[1] The Court will issue a separate order on the Motion by Debtor for Substantive Consolidation with the Estate of Springbrook Grain Farms, LLC, Case No. 17-13842-12.

Springbrook's Motion for Adequate Protection on January 16, 2018, at 1:00 p.m., in Eau Claire, via video conference.

## FACTS

Debtor is a farmer who primarily raises corn and soybeans. He is the sole owner and operator of Springbrook Grain Farms, LLC. The Plan proposes payments of $8,150 per month for 12 months, then $11,700 per month for 36 months, and finally $13,700 per month for 12 months. In total, the Plan proposes payment of $683,400 over 60 months. Debtor asserts this will pay creditors in full.

Debtor's proposed Plan treats creditors as follows:

| Type of Claim | Claimant | Treatment | Claim Amount | Interest Rate |
|---|---|---|---|---|
| Administrative Expenses | | | | |
| | Trustee | Percentage fixed by Court | | |
| | Attorney Fees | Paid to the extent they don't reduce payments to secured and priority creditors | | |
| Secured Creditors Paid Through Trustee | | | | |
| | CNHi | Amortized over 10 years; payment of $2,650.38 for 12 months; subsequent payments of $4,208.41 | $370,113.55 | 5.5% |

2

|  | Creditor | Terms | Amount | Rate |
|---|---|---|---|---|
|  | Ford Motor Credit (secured by 2014 Ford F350) | Amortized over 10 years; payment of $350.28/month | $27,934.57 | 6% |
|  | Ford Motor Credit (secured by 2014 Ford Edge) | Amortized over 10 years; payment of $318.77/month | $23,057.33 | 6% |
|  | Polk County (secured by real estate) | Amortized over 5 years; payment of $252.42 per month | $11,347.59 | 12% |
|  | Swift Financial (secured by accounts receivable) | Amortized over 10 years; payment of $252.71 for 12 months, then $401.27 per month | $35,289.73 | 5.5% |
|  | Cooperative Finance Ass'n (secured by crops) | Amortized over 5 years; payment of $3,162.04 per month | $165,541.58 | 5.5% |
| Secured Creditors Paid Directly |  |  |  |  |
|  | Hiawatha National Bank | Amortized over 10 years; payment of $1,526.78 per month for 12 months, then $2,424.29 for balance of term | $213,207.25 | 5.5% |
|  |  | Amortized over 10 years; payment of $1,864.62 per month for 12 months, then $2,960.74 for balance of term | $260,385.56 | 5.5% |

3

| | | | | |
|---|---|---|---|---|
| | | Amortized over 10 years; payment of $3,506.23 per month for 12 months, then $5,567.37 for balance of term | $489,628.95 | 5.5% |
| | | Amortized over 30 years; payment of $3,421.08 per month for 12 months, then $2,424.29 for balance of term | $912,580.04 | 5.5% |
| Unsecured Claims | | Pro rata distribution of any payments in excess of the amounts required for stated payment amounts through Trustee | Not stated, but based on filed claims and schedules, the claims total $95,430.38 | none |

The payments to Hiawatha total $12,860.14 per month in the first year and $20,198.82 per month through year 10.

The Plan states there are no claims entitled to priority under section 507. Any that do exist are to be paid pro rata. If any such claim is for a tax, that is to be paid first by the payments to the Trustee. If a section 507 claim is unpaid, then it will be discharged at the end of the Plan.

The Plan also provides special treatment for claims of Cooperative Finance and CNHi. Cooperative held a security interest in Debtor's pre-petition crops. Debtor proposes payment to Cooperative of $40,000 by the date of

4

confirmation and that the claim not be discharged until paid in full. If the case is dismissed or converted to a chapter 7, then CNHi "may challenge the purported transfer of the Case IH 8240 Combine and the liability under the security agreement . . . from Springbrook Grain Farms, LLC to the Debtor." *Plan* at 7.

The Debtor has leases with Batavia Leasing Co., Universal Leasing Services, and Northland Capital Financial Services, LLC. The Plan provides the leases will be assumed and that lease payments will be paid directly. Based on the Proofs of Claim, it appears there are defaults that must be cured under two of the leases. The Plan is silent on the cure amounts or arrangements therefor.

The Debtor has filed motions to assume on each of those leases, which state cure amounts as follows:

| Batavia Leasing Co. | $28,562.34 |
| Universal Leasing Services | 38,593.36 |
| **Total** | $67,155.70 |

Adding the cure amounts to the payment to Cooperative Finance, the Debtor would be required to pay $107,155.70 immediately upon confirmation.

## DISCUSSION

To be confirmed, a Chapter 12 Plan must meet the requirements of section 1225 of the Code. A Plan must meet the following seven requirements:

1. The Plan must comply with Title 11;
2. The Plan must be proposed in good faith;
3. Any required fee or charge must have been paid;

5

4. The property to be distributed on account of each unsecured claim must be not less than would be paid in a chapter 7 liquidation;

5. Secured creditors either:

   a. Accept the Plan,

   b. Retain their liens, and receive no less than the allowed amount of their claims, or

   c. Debtor surrenders the collateral;

6. The debtor must be able to make all payments under the Plan and comply with the Plan; and

7. The debtor must have paid any domestic support obligations that first came payable after the petition was filed, if required.

If the trustee or an unsecured creditor objects to confirmation, the court may not approve the Plan unless:

1. The creditor will receive no less than the amount of its claim; or

2. All of the debtor's disposable income during a specified three-year period will be applied to Plan payments; or

3. The value of the property to be distributed under the Plan is no less than the debtor's projected disposable income for a specified three-year period.

Debtor has the burden of proving compliance with these requirements by a preponderance of the evidence.

For the following reasons, the Court cannot confirm the Debtor's Plan:

1. *Feasibility*

The Debtor's Plan is not feasible. At confirmation the Debtor will immediately pay $40,000 to Cooperative Finance. Based on the Proofs of Claim, the Debtor would also be required to immediately pay $67,155.70 to cure defaults on leases to be assumed. Other than vague testimony that funds were available to satisfy the immediate payment to Cooperative Finance, there was no evidence presented that supports any ability to make the lease cure payments. In the first 12 months of the Plan, the Debtor will pay in the aggregate $21,010.14 per month combining payments to the Trustee and direct payments to Hiawatha. That totals $252,121.70 the first year. For the following three years, the Plan proposes monthly payments of $31,898.82 per month for total yearly payments of $382,785.84. In the final year of the plan, the Plan provides for monthly payments of $33,898.82 for a total yearly payment of $406,785.84.

The evidence to which Debtor points supporting the ability to make payments are his tax returns for the years 2012 through 2015. Debtor's income for those years before depreciation, mortgage payments, and interest is as reported on his Tax Return Schedule F:

| Year | Net income | Depreci-ation (D) | Interest (I) | Mortgage (M) | Net of D, I & M |
|---|---|---|---|---|---|
| '12 | 17,217 | 67,737 | 23,706 | 1,603 | 110,263 |
| '13 | (50,477) | 87,970 | 49,233 | -- | 86,726 |
| '14 | (62,203) | 95,629 | 46,191 | 11,692 | 91,579 |
| '15 | (160,210) | 154,385 | 626 | 43,499 | 38,300 |

7

The foregoing also included crop insurance payments. The Debtor is no longer eligible for crop insurance.

Alternatively, the Debtor argues gross income should be the basis for judging projections. Based on the tax returns, less any payments from crop insurance, the following would be historic gross and net:

|  | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Gross farm income (excludes crop insurance) | 510,736 | 358,841 | 396,109 | 385,618 |
| Custom and Program payments | 6,412 | 5,066 | 9 | 20,158 |
| **Gross** | **517,148** | **363,907** | **396,118** | **405,776** |
| Expenses (excludes depreciation, interest, and mortgage) | (446,095) | (552,114) | (454,700) | (397,476) |
| Insurance | (25,000) | (58,505) | (31,000) | (37,000) |
| **Net Income** | **46,053** | **(246,712)** | **(89,582)** | **(28,700)** |

Despite a four-year history, the Debtor's projections for his anticipated gross income for the years 2018 through 2020 are all near or in excess of $600,000. According to Debtor's estimates, he will do better in each of the next three years than he did at any time between 2012 and 2015. The Debtor projects:

|  | 2018 | 2019 | 2020 |
|---|---|---|---|
| Gross Income | 599,550 | 624,150 | 624,150 |
| Custom and Program | 19,600 | 19600 | 19600 |
| Expenses | (353,663) | (374,007) | (371,007) |
| **Net** | **265,487** | **269,743** | **272,743** |

8

If Debtor's projections were accurate, he would be able to meet the terms of the Plan at least through 2020. But, based on the picture presented by the Debtor's tax returns and testimony, the Debtor's projections are unpersuasive and lack any credibility. The Debtor estimates his gross income from crops will suddenly swell over the next three years and his expenses will be less than any of the last four years.[2] He offered no explanation for how income would substantially increase while expenses would drop dramatically. He testified he intends to devote more acreage to corn in the coming years and decrease acreage for soy beans. He also testified corn sold at $3.60 per bushel while soy sold at $9.50 per bushel. The Debtor provided no explanation for how this change would result in greater income or reduced expenses. While, the Court supposes, it is possible a change in use of acreage might positively affect income, there was no testimony to that effect. The Court will not speculate on the subject.

Neither was there any testimony—other than a reference to reduced insurance expenses—that would explain the reduction in expenses ranging from approximately 6% to as much as 30%. In addition, the Debtor's projections make no allowance for possible crop loss. As a result of the Debtor's conviction for crop insurance fraud, he is no longer eligible for crop insurance, and therefore any crop loss would directly reduce income. While he testified his insurance expenses would decrease because he would not be paying for crop

---

[2] A similar calculation based on the Debtor's draft 2016 Schedule F reflects Gross of $447,956 and Net Income of -$115,343 after expenses in excess of $525,000.

9

insurance, that would reduce expenses by only approximately $30,000. There is no "reserve" for crop loss in the projections, and the past reported crop loss proceeds ranged from $39,210 to $274,933. The Debtor testified there are farming methods he can use to avoid the need for insurance and to insulate himself from possible loss. No explanation about why the methods were not used in the past or what the costs of such methods would be was presented. Based on the nature of farming and the historic experience of this Debtor, the risk of crop damage or loss cannot be discounted. The fact that the Debtor's projections failed to account for the possibility of such loss casts even more doubt on his projections. The Court finds no believable testimony that the Debtor has contingency plans to address the risk of crop loss.

At the confirmation stage, it is the Debtor's burden to show the projections are reasonably possible. In total, the Debtor has failed to show the Plan is feasible. Based on his tax returns alone, the Debtor's projections do not reflect the reality of his farm operation. Adding the fact the Debtor is no longer eligible for crop insurance, it is clear the Debtor's projections are mere wishful thinking.

Drawing from the net income reported on the tax returns, the Debtor will not be able to make Plan payments. Between 2012 and 2015, the highest net income—excluding depreciation, interest, and mortgage payments—was about $46,000. Under the Plan, yearly payments range from $248,520 to $406,785.84. Based on historic results, the Debtor would have nowhere near enough income to make the proposed payments.

The Debtor's projections on his crop yields are also dubious. At the confirmation hearing, the Debtor testified that his corn yield ranged from 50 to 204 bushels per acre between 2010 and 2014. Despite that range, the Debtor projects over the next three years he will consistently have a 205 bushels per acre yield rate. Somehow and without explanation, the Debtor anticipates that he will have a yield over the next three years equal to or greater than <u>any</u> yield between 2010 and 2014. Again, the Debtor's projections and Plan reflect best hopes and wishful thinking rather than a realistic or credible assessment of his anticipated yields. It was apparent from the Debtor's testimony that the projections were the product of determining the amount needed to meet Plan payments and then adjusting projections to satisfy feasibility. In summary, the Debtor has failed to meet his burden in showing the Plan is feasible.

*2.    Interest Rate*

Hiawatha National Bank, a secured creditor, objected to the Plan. Therefore, under section 1225, the Court may only approve the Plan if the Debtor surrenders Hiawatha's collateral or if Hiawatha retains its liens and receives the value of its claim as of the effective date.

The Debtor's Plan proposes paying Hiawatha's various secured claims at a 5.5% interest rate. Dating from 2014 and 2015, notes 7461, 7607, and 7610 are secured by a mortgage and farm property and provided a variable interest rate originally set between 4.5% and 4.75%. The original term of the fixed interest rates in those notes was between 19 to 60 months, but the Plan amortizes all those claims over 10 years from confirmation.  The remaining

11

notes—notes 7609 and 7608—are secured only by a mortgage and were at an original interest rate of 4.5%. The Plan amortizes these claims over 30 years. When originally executed, the term for note 7609 was one year and the term for 7608 was 5 years with a fixed interest rate.

Under *Till v. SCS Credit Corp.*, Hiawatha is entitled to a "prime plus" interest rate. 541 U.S. 465, 479 (2004). The *Till* formula takes the national prime rate and increases it in light of the risks posed to a particular creditor under the Plan. The types of risk a court will consider in a *Till* analysis include the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan. *Till*, 541 U.S. at 479. Moreover, in the context of Chapter 12 cases, risk is often heightened due to the unpredictable nature of the agricultural economy. *See In re Fowler*, 903 F.2d 694, 697-98 (9th Cir. 1990); *United States v. Doud*, 869 F.2d 1144, 1145 (8th Cir. 1989). In light of the risk factors, bankruptcy courts applying the *Till* formula generally adjust the rate upward by 1% to 3% depending on the risk. *Wells Fargo Bank N.A. v. Tex. Grand Prairie Hotel Realty, L.L.C. (In re Tex. Grand Prairie Hotel Realty, L.L.C.)*, 710 F.3d 324, 333 (5th Cir. 2013).

The interest rate proposed for Hiawatha in the Debtor's Plan is inadequate under *Till*. Currently, the national prime interest rate is 4.5%. The Debtor proposes the minimum risk adjustment provided by *Till*—1%. Yet, the Plan proposes extending the term of all of the loans and fixing the rate for those extended periods. The Debtor testified, without further explanation, that he believed the increase adequately compensates Hiawatha for its increased

12

Case 1-17-11448-cjf    Doc 137    Filed 01/12/18    Entered 01/12/18 14:23:03    Desc
Main Document    Page 13 of 16

risk. When asked about how he arrived at the term and rate, he said he didn't know and the question should be posed to his lawyer.

In response, Hiawatha's Commercial Loan Officer, Roger Ray ("Ray"), testified that Hiawatha, as a small bank, would never agree to a fixed interest rate for more than five years. The Plan would lock the bank into the 5.5% interest rate for significantly longer than it would consider under normal circumstances. Further, Ray testified it would present too much risk and terms that are in excess of market even outside of bankruptcy.

The circumstances of the estate strongly favor a higher interest rate. As noted, the Debtor is no longer eligible for crop insurance and is exposed to the serious risk of crop loss. The Debtor's tax returns show he is consistently reporting losses or barely breaking even. The Debtor's precarious financial situation is further demonstrated by this petition, his bankruptcy in 1996, and now the bankruptcy of his sole membership LLC. Moreover, the Plan significantly extends the terms of some of the loans and at rates inconsistent with market rates even before a risk adjustment.

Despite those many risk factors, Debtor proposes an increase of just 1%—the absolute minimum under *Till* and other cases that have addressed this issue. The amortization periods are also excessively long with fixed rates. No such terms are available in the market and this again underscores the absence of any reasonable basis other than that Debtor's counsel computed what Debtor could allegedly afford rather than presenting evidence that would support a conclusion Hiawatha would receive the equivalent of its claim under

appropriate terms. The Plan therefore fails to satisfy section 1225 because it does not provide that Hiawatha will receive the full value of its claim as of the effective date. Hiawatha would be subject to a significant degree of risk under the Plan and Debtor's proposed interest rate is inadequate.

   3.   *Should Debtor's case be dismissed?*

"The decision to dismiss a Chapter 12 bankruptcy petition is within the sound discretion of the bankruptcy court." *Keith's Tree Farms v. Grayson Nat. Bank*, 535 B.R. 647, 654 (W.D. Va. 2015). *See also In re Brown,* 82 F.3d 801, 806 (8th Cir. 1996). There is no motion to dismiss before this Court, but "[s]ection 305(a) provides that the Court may dismiss a case under the Bankruptcy Code at any time if the interests of creditors and the debtor would be better served by such dismissal." *In re Coram Graphic Arts*, 11 B.R. 641, 645 (Bankr. E.D.N.Y. 1981). Furthermore, the Court may find cause to dismiss where debtor "lack[s] the ability to propose a confirmable Chapter 12 plan." *In re Mosbrucker*, 227 B.R. 434, 438 (B.A.P. 8th Cir. 1998), *aff'd*, 198 F.3d 250 (8th Cir. 1999). *See also 8 Collier's* ¶1208.03 n.3 ("As in cases under other chapters of the Code, cause may be found if the court determines that the debtor has no realistic prospect of confirming a plan.").

The Debtor filed this petition in April of 2017. After obtaining an extension, the Debtor filed a Plan on August 22, 2017. Amended Plans were filed on November 3, 2017, and December 14, 2017. The final hearing on confirmation was held December 14, 2017. Two hundred thirty-three (233) days elapsed between the petition date and the confirmation hearing. No

14

credible evidence was produced in that period that would permit a finding any plan can be confirmed within a reasonable time.

It is clear the Debtor will be unable to make the proposed payments. If the Debtor amended his Plan to provide a higher interest rate to Hiawatha, the Plan would still not be confirmable. Providing a higher interest rate to Hiawatha would exacerbate the Plan's feasibility issue. The projections lack any credibility or support and it would be impossible for Debtor to ever propose a confirmable plan. To permit this case to continue when it is clear a plan will never be confirmed would result in accumulation of unnecessary administrative expenses, a waste of the estate's resources, and harm to creditors. Based on the record before the Court, the Debtor will never be able to propose a confirmable plan and the case should be dismissed.

## CONCLUSION

The Court denies confirmation of Debtor's Plan because it is not feasible and proposes an inadequate interest rate on Hiawatha's claims. Based on the Court's findings and conclusions that no plan can be confirmed within a reasonable period of time, this case is dismissed. Dismissal will be stayed for 14 days to permit the Debtor the opportunity to convert.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated:  January 12, 2018

                          BY THE COURT:

                          Hon. Catherine J. Furay
                          U.S. Bankruptcy Judge